UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

SHLOMO LEIBOVITCH, GALIT LEIBOVITCH, HILA
LEIBOVITCH, MOSHE LEIBOVITCH, SHIRA
LEIBOVITCH, JENNY RUBIN, DEBORAH RUBIN,
DANIEL MILLER, ABRAHAM MENDELSON,
STUART HERSH, NOAM ROZENMAN, ELENA
ROZENMAN, TZVI ROSENMAN, SETH KLEIN BEN
HAIM, LAVI KLEIN BEN HAIM, BERNARD KLEIN
BEN HAIM, SUSAN WEINSTEIN, JOSEPH
WEINSTEIN, JENNIFER WEINSTEIN HAZI and
DAVID WEINSTEIN,

      ___ CV _____ (___)


      **COMPLAINT**

      Jury trial demanded

Plaintiffs,

-against-

UNITED STATES DEPARTMENT OF STATE; JOHN
KERRY, in his official capacity as Secretary of State;
UNITED STATES DEPARTMENT OF TREASURY;
and JACOB J. LEW, in his official capacity as Secretary
of the Treasury,

Defendants.

-----------------------------------------------------------------------X

Plaintiffs, by their counsel, complain of the Defendants, and hereby allege for their

Complaint as follows:

### INTRODUCTION

1.      Each of the Plaintiffs holds a judgment from a United States Federal Court against

the Islamic Republic of Iran ("Iran") pursuant to §1605(a)(7) and/or §1605A of the Foreign

Sovereign Immunities Act ("FSIA"). The aggregate amount of the compensatory damages

portions of these judgments is $152,748,164.

2.      These judgments are enforceable against the blocked assets of Iran, including the

Central Bank of Iran and other Iranian financial institutions, pursuant to § 201 of the Terrorism

Risk Insurance Act ("TRIA"). In passing the TRIA, Congress expressed a clear policy in favor of

broad enforcement of FSIA judgments against the blocked assets of terrorist parties, such as Iran.

Under TRIA § 201, the term "blocked asset" includes "any asset with respect to which financial

transactions are prohibited or regulated by the U.S. Treasury under any blocking order under the

Trading With the Enemy Act, the International Emergency Economic Powers Act, or any

proclamation, order, regulation, or license."

3.      Accounts of the Central Bank of Iran and other Iranian financial institutions held

in foreign bank accounts are subject to United States blocking sanctions pursuant to laws passed

by Congress in 2010-2012. Such sanctions are to be lifted only if certain conditions are met,

including that the President provides Congress with a certification that Iran no longer funds

terrorism. Defendants, the Department of the Treasury and the Secretary of the Treasury are

responsible for enforcing these blocking laws through the Office of Foreign Assets Control

("OFAC").

4.      Although the President is not able to certify to Congress that Iran has ceased

funding terrorism, the July 14, 2015 Joint Comprehensive Plan of Action dated (the "JCPOA")

entered into between the United States, through Defendants the Department of State and the

Secretary of State, the P5+1, and Iran, provides for the United States sanctions against these

Iranian accounts, which contain $100 to $150 billion in accrued escrow funds, to be released

upon implementation of the agreement. Thus, as a result of the JCPOA, the Plaintiffs will lose

their last remaining opportunity to pressure Iran to satisfy their judgments.

5.      By allowing these billions of dollars in escrow funds to be released, the Executive

Branch will be undermining both (i) the intent of Congress to allow Plaintiffs, who are victims of

Iranian terrorism, to enforce their judgments against a broad range of blocked assets and (ii)

Plaintiffs' judgments themselves, each of which was issued by a United States federal court. Defendants have a duty to these Plaintiffs not to let these billions of dollars in escrow funds disappear from their judgment enforcement reach thereby removing any leverage Plaintiffs have to enforce their judgments against Iran.

6.      By this action, Plaintiffs seek to enjoin the Implementation of the JCPOA which will release billions of dollars to Iran, until the compensatory damages portion of their judgments (totaling just over $1.5 billion) is paid in full.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 1346(a)(2) and § 1361.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## THE PARTIES

9.      Plaintiffs Shlomo and Galit Leibovitch are the parents of Plaintiff Shira Leibovitch, who was severely injured in a Palestine Islamic Jihad shooting attack on their family vehicle in Israel on June 17, 2003, and decedent Noam Leibovitch who was killed in the attack. Plaintiffs Hila and Moshe Leibovitch are the siblings of Plaintiff Shira Leibovitch and decedent Noam Leibovitch. The Leibovitch Plaintiffs hold judgments dated February 1, 2011 and March 31, 2014 against Iran from the U.S. District Court for the Northern District of Illinois in the aggregate amounts of $32,000,000. *See Leibovitch v. Syrian Arab Republic*, 2011 WL 444762 (N.D. Ill. Feb. 1, 2011); *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d 1071 (N.D. Ill. March 31, 2014).

10.     Plaintiffs Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Hersh and Noam Rozenman were severely injured in a Hamas suicide bombing in Jerusalem on September

4, 1997. Plaintiff Deborah Rubin is the mother of Jenny Rubin; Plaintiff Renay Frym is the wife of Stuart Hersh and Plaintiffs Elena Rozenman and Tzvi Rozenman are the parents of Noam Rozenman. The Rubin Plaintiffs hold a judgment dated September 10, 2003 against Iran from the U.S. District Court for the District of Columbia for $71,500,000 in compensatory damages. *See Campuzano v. Islamic Republic of Iran,* 281 F. Supp. 2d 258 (D.D.C. 2003).

11.     Plaintiff Seth Klein Ben Haim was severely injured in a Palestine Islamic Jihad suicide bombing on a bus in the Gaza strip on April 9, 1995. Plaintiffs Bernard Klein Ben Haim and Lavi Klein Ben Haim are, respectively, the father and brother of Seth Klein Ben Haim. The Ben Haim Plaintiffs hold a judgment dated March 24, 2006 against Iran from the U.S. District Court for the District of Columbia for $16,000,000 in compensatory damages. *See Ben Haim v. Islamic Republic of Iran*, 425 F. Supp.2d 56 (D.D.C. 2006).

12.     Plaintiffs Susan Weinstein is the widow of decedent Ira Weinstein, who was killed in a Hamas suicide bombing in Jerusalem on April 13, 2006. Plaintiffs Joseph Weinstein, Jennifer Weinstein Hazi and David Weinstein are the children of decedent Ira Weinstein. The Weinstein Plaintiffs hold a judgment dated February 6, 2002 against Iran from the U.S. District Court for the District of Columbia for $33,248,164 in compensatory damages and $150,000,000 in punitive damages. *See Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 23 (D.D.C. 2002).

13.     Defendant United States Department of State is a federal agency responsible for foreign affairs, whose chief administrator is the Secretary of State. In carrying out its responsibilities, the Department of State must comply with applicable requirements of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA"), as

modified by the Iran Threat Reduction Act of 2012 ("ITRA") and the National Defense Authorization Act FY2012 ("NDAA FY 2012"), as modified by ITRA.

14.     Defendant John Kerry is the Secretary of State. In his capacity, Secretary Kerry is the President's chief of foreign affairs and is responsible for carrying out the President's foreign policies. In his official capacity, Defendant John Kerry was the representative of the United States in the negotiations that resulted in the JCPOA. In carrying out these duties, Secretary Kerry must ensure compliance with CISADA, NDAA FY2012 and ITRA.

15.     Defendant United States Department of Treasury is a federal agency responsible for administering and enforcing the economic and trade sanctions against Iran through the OFAC. In carrying out its responsibilities, the Department of Treasury must comply with applicable requirements of CISADA, NDAA FY2012 and ITRA.

16.     Defendant Jacob Lew is the Secretary of Treasury. Secretary Lew is responsible for implementing the sanctions against Iran through OFAC. In carrying out these duties, Secretary Lew must ensure compliance with CISADA, NDAA FY2012 and ITRA.

## FACTS

### A.      The Plaintiffs' Rights to Enforce Their Judgments

17.     Each of the Plaintiffs is the victim of a terror attack sponsored by Iran, carried out through one of its terrorist proxies in the Middle East.

18.     Each of the Plaintiffs holds a judgment against Iran from a United States Federal District Court pursuant to the terrorist exception to the FSIA – formerly 28 U.S.C. §1605(a)(7), now codified as 28 U.S.C. §1605A – which divests foreign states of immunity for carrying out or providing material support for acts of terrorism.

19.     Plaintiffs are entitled to enforce their judgments against the blocked or frozen assets of Iran pursuant to, *inter alia*, the Terrorism Risk Insurance Act ("TRIA") § 201.

20.     TRIA § 201 was legislated by Congress in 2002 to facilitate the enforcement of judgments, like those held by Plaintiffs, against state sponsors of terror – "to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties." 148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin).

21.     TRIA § 201 provides in relevant part:

*Notwithstanding any other provision of law*, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605 (a)(7) ... of title 28, United States Code, *the blocked assets of that terrorist party* (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment....

TRIA § 201(a) (emphasis added).

22.     The term "blocked asset" is defined as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. § 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701–1702)." TRIA § 201(d).

23.     According to the legislative history of the TRIA:

the term 'blocked asset' has been broadly defined to include any asset that has been seized by the United States in accordance with law ... includ [ing] any asset with respect to which financial transactions are prohibited or regulated by the U.S. Treasury under any blocking order under the [TWEA], the [IEEPA], or any

proclamation, order, regulation, or license," and excepting only assets to which
the United States claims ownership.

148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin) (emphasis added).

24.    Over the years, Plaintiffs have attempted, with mixed success, to enforce their
judgments against a variety of blocked or frozen assets of Iran in the United States. *See, e.g.*,
*Rubin v. Iran*, 33 F. Supp. 3d 1003 (N.D. Ill. 2014) (Iranian antiquities on loan to University of
Chicago not blocked); *Rubin v. Iran*, 709 F.3d 49 (1st Cir. 2013) (Iranian antiquities in United
States not blocked assets); *Ministry of Defense and Support for Armed Forces of Islamic
Republic of Iran v. Cubic Defense Systems*, 984 F. Supp.2d 1070 (S.D. Cal. 2013) (permitting
attachment of arbitral award in favor of Iranian Ministry of Defense); *Weinstein v. Iran*, 609 F.3d
43 (2d Cir. 2010 (receiver could be appointed to sell property owned by Iranian bank); *Bank of
New York v. Rubin*, 484 F.3d 149 (2d Cir. 2007) (holding that bank assets sought to be attached
were not "blocked" assets). In some of these cases Iran has actively litigated against Plaintiffs'
judgment enforcement efforts. To date, the vast majority of Plaintiffs' judgments remain
outstanding.

25.    Most recently, Plaintiffs commenced an investigation into blocked assets of the
sanctioned Central Bank of Iran held by certain third party foreign banks with the intent of
enforcing their judgments against these accounts. However, because these blocked assets are
located outside of the United States, Plaintiffs faced obstacles in obtaining discovery with
respect to the accounts.

**B.    Sanctions Against Iran**

26.    Since 1984 until the present time, Iran has been continuously designated by the
United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the
Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

27.     From 1979 and until today, Iran has been continuously linked to terrorist attacks around the world.

28.     Iran is known to support various terrorist groups active in the Middle East, such as Hezbollah, Hamas and Palestine Islamic Jihad, all of which have carried out numerous deadly attacks against civilians, including the attacks in which Plaintiffs were harmed. Iran also supports the regime of Syrian President Bashar al-Assad, Iraqi Shia militants and the Houthis in Yemen and provides safe haven to senior al-Qaeda members.

29.     According to the State Department's 2013 report on terrorism, "Iran used the Islamic Revolutionary Guard Corps-Quds Force ("IRGC-QF") and its regional proxy groups to implement its foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East." IRGC is known to provide training and financing to terrorist operatives.

30.     Iran has been subject to economic and trade sanctions in some form since the 1979 Islamic Revolution and hostage crisis and the October 1983 bombing of the U.S. marine base in Lebanon.

31.     These sanctions have been expanded in recent years pursuant to the Comprehensive Iran, Sanctions, Accountability, and Divestment Act of 2010 ("CIASDA") as modified by the ITRA and the NDAA FY 2012, as modified by ITRA. The sanctions are directed towards Iran's role in terrorist financing and its nuclear expansion efforts.

32.     The United States sanctions against Iran include financial and banking sanctions pursuant to which U.S. based institutions are prohibited from having financial dealings with Iranian financial institutions and foreign based financial institutions or subsidiaries that deal with sanctioned banks are barred from conducting business in the United States or with the U.S.

Dollar. The sanctions have the effect of freezing Iranian assets all over the world, including many international bank accounts and banking transactions.

33.    Among other Iranian financial institutions, the Central Bank of Iran has been, since 2012, a primary target of U.S. sanctions, which include blocking of property and restrictions and prohibitions on financial transaction and the exportation of property.

34.    In 2011, Defendant, the Department of the Treasury made a Section 311 PATRIOT Act finding that the entire "Islamic Republic of Iran is a jurisdiction of primary money laundering concern" due to its support for terrorism, pursuit of weapons of mass destruction and the illicit and deceptive financial activities of its financial institutions. The Department of the Treasury specifically targeted the Central Bank of Iran, making clear that the country's entire financial system posed "illicit finance risks for the global financial system." The Central Bank of Iran is the main financial conduit for the full range of Iran's illicit activities.

35.    Based on that Section 311 Patriot Act finding, Congress enacted Section 1245 of the National Defense Authorization Act (NDAA) of FY2012, as amended by Section 504 of the ITRA, which provides for sanctions against foreign financial institutions conducting transactions with the Central Bank of Iran and other Iranian financial institutions subject to United States sanctions. Congress has provided that these sanctions shall terminate if the President submits a certification to Congress that, *inter alia*, "the Government of Iran has ceased providing support for acts of international terrorism and no longer satisfies the requirements for designation as a state sponsor of terrorism." CISADA Section 401, cited as 22 U.S.C. § 8551(a)(1) .

36.    In connection with the Section 311 Patriot Act finding, Iran was also removed from the SWIFT (Society for Worldwide Interbank Financial Telecommunication) global payments system in 2012.

37.     As a result of the above sanctions, Iran has been isolated from the international banking system and international markets leading to devastating effects on Iran's trade and commerce.

38.     While the sanctions have been successful in constricting Iran's economy and limiting its ability to procure military equipment, Iran continues to finance and support terrorism.

## C.     The Joint Comprehensive Plan of Action

39.     On July 14, 2015, Iran and the P5+1 signed the JCPOA, which provides for the lifting of sanctions against Iran by the EU, the UN and the U.S. *See* ¶¶ 18-33. Annex II of the JCPOA specifies the sanctions that are to be lifted.

40.     The United States sanctions are address in Paragraph 4 of Annex II, which provides in relevant part:

> The United States Commits to cease the application of, and to seek such legislative action as may be appropriate to terminate, or modify to effectuate the termination of, all nuclear-related sanctions as specified in Sections 4.1-4.9 below, and to terminate Executive Orders 13574, 13590, 13622 and 13645, and Sections 5-7 and 15 of Executive Order 13628, in accordance with Annex V.

*Id.*

41.     Paragraph 4.1 of Annex II addresses the Financial and banking sanctions that are to be lifted, with particular reference to transactions with the Central Bank of Iran and to NDAA FY2012 Sections 1245(d)(1) and (3), which is specifically directed to foreign financial institutions that conduct transactions with the Central Bank of Iran and other Iranian financial institutions. JCPOA, Annex II, B, ¶¶ 4.1.1-4.1.7.

42.     In addition to the Central Bank of Iran, other major Iranian banks (with ties to the IRGC) will be delisted, including the Melli, Mellat and Sepah banks.

43.     Along with these provisions, the JCPOA also provides for Iran's reentry into the SWIFT financial system, which is crucial to the ability of Iranian banks to operate in the global financial system. JCPOA ¶ 19, iv. This, together with the de-listings of major Iranian financial institutions will enable Iran to more easily launder money, transfer funds for terrorist use and make the enforcement of terrorism financing laws much more difficult.

44.     Pursuant to the Iran Nuclear Agreement Review Act of 2015, The United States Congress has 60 days from July 14, 2015 to vote on the JCPOA.

45.     Annex V of the JCPOA provides that the JCPOA will be adopted 90 days after being endorsed by the UN Security Council. The UN Security Council unanimously endorsed the JCPOA on July 20, 2015. Thus, the JCPOA will be adopted on or about October 28, 2015. JCPOA Annex 5, ¶ 6.

46.     Annex V further provides that the aforementioned relief from United States sanctions will take effect on Implementation Day, which is tied to IAEA verified implementation by Iran of certain specified nuclear-related measures. *Id*. at ¶ 14. ("The United States, acting pursuant to Presidential authorities, will issue waivers, to take effect upon Implementation Day, ceasing the application of the statutory nuclear-related sanctions as specified [in the JCPOA]." *Id*. at ¶ 11).

47.     As a result of this sanctions relief, Iran will be reinserted into the global financial system, notwithstanding its continued money laundering and support for terrorism and despite the Congressional policy expressed in NDAA FY2012, ITRA and CISADA that sanctions should not be lifted absent Presidential certification that Iran no longer supports terrorism.

48.     The lifting of these sanctions will enable Iran to access $100 to $150 billion in hard currency mainly from frozen oil profits that are accumulating in ITRA restricted escrow

accounts held by foreign financial institutions. These accounts fall within the definition of "blocked" assets under TRIA § 201 and are subject to judgment enforcement by Plaintiffs. Thus the lifting of sanctions will result in Plaintiffs losing their only remaining leverage against Iran to enforce their judgments.

49.     Moreover, the IRGC is likely to gain access to some portion of these funds, either through monies allocated to it in Iran's annual budget, or through improvements to Iran's economy because the IRGC controls strategic sectors of the Iranian economy, including banking, energy, construction, industrial, engineering, mining, shipping, shipbuilding and others. Any increase in funds to the IRGC will result in increased IRGC support for terrorist groups such as Hamas and Palestine Islamic Jihad.

50.     President Obama himself has acknowledged that these funds may be used to finance terrorism against American interests. Along these lines, one State Department Official has remarked "We are of course aware and concerned that, despite the massive domestic spending needs facing Iran, some of the resulting sanctions relief could be used by Iran to fund destabilizing actions."

51.     As victims of Iranian sponsored terrorism, Plaintiffs are gravely concerned that the increase of funds available to the IRGC will result in increased Iranian sponsored terror activities which are likely to cause death or serious injury to other American citizens.

## COUNT I
## PURSUANT TO MANDAMUS ACT 28 U.S.C. § 1361

52.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

53. Pursuant to TRIA § 201, Plaintiffs have the right to enforce their judgments against all blocked assets of Iran, including the Central Bank of Iran accounts held in foreign financial institutions that are to be released from sanctions under the JCPOA.

54. Defendants have a duty to the Plaintiffs not to hinder their ability to enforce their federal judgments by removing Plaintiffs only remaining leverage against Iran.

55. Further, by lifting sanctions against the accounts at issue, thereby preventing Plaintiffs from being able to enforce their judgments against Iran, Defendants will be undermining Plaintiffs' federal judgments and the Congressional intent expressed in TRIA § 201 that Plaintiffs should have broad judgment enforcement capabilities.

56. To the extent there is any conflict between Plaintiffs' ability to enforce their judgments under TRIA § 201 and the decision of the Executive to relieve sanctions against Iran, TRIA § 201 should prevail, as the language of TRIA § 201 provides "Notwithstanding any other provision of law," which is intended to supersede other laws.

57. Depriving Plaintiffs of the ability to enforce their judgments constitutes an unconstitutional taking without just compensation in violation of the Fifth Amendment.

58. Plaintiffs will suffer irreparable injury unless Defendants are compelled to leave the sanctions in place until the compensatory damages portions of Plaintiffs' judgments are collected in full.

59. This Court has jurisdiction and authority to grant the requested relief pursuant to 28 U.S.C. § 1361.

## COUNT II
### INJUNCTION

60. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

61.     Plaintiffs request that the sanctions against the Central Bank of Iran and other Iranian financial institutions as set forth in JCPOA Annex II, Paragraph 4, remain in place until the compensatory damages portion of Plaintiffs' judgments against Iran totaling $152,748,164 is paid in full.

62.     Iran has steadfastly refused to satisfy these judgments. Even more, Iran has actively litigated to prevent some of Plaintiffs' judgment enforcement efforts against Iranian assets located in the United States.

63.     To date, only a tiny fraction of Plaintiffs' judgments has been collected. While Plaintiffs continue to search for blocked Iranian assets against which they may enforce their judgments pursuant to TRIA § 201, Iran remains a designated state sponsor of terror and continues to spend billions of dollars on terrorism.

64.     Implementation of the JCPOA absent the requested injunctive relief will directly and irreparably harm Plaintiffs' ability to collect their judgments, particularly with respect to the Central Bank of Iran accounts held in foreign financial institutions which until now have been blocked and, therefore, subject to enforcement under TRIA § 201. Upon implementation of the JCPOA, United States sanctions will be lifted and the accounts will not be subject to enforcement under TRIA § 201. Thus, Plaintiffs will lose their only remaining leverage against Iran to enforce their judgments.

65.     Granting the requested relief is in the public interest as expressed by Congress in its statutes. Specifically, in passing TRIA § 201, Congress expressed a policy and intent favoring broad enforcement of judgments against state sponsors of terrorism. Further, in the statutes pursuant to which the aforementioned accounts are blocked (NDAA FY 2012 § 1245, ITRA § 504 and CISADA § 401), Congress expressed a policy and intent that such sanctions should be

lifted only if specific conditions are satisfied, which include a certification by the President that Iran is no longer a financier and sponsor of terror. That terrorism condition has not been satisfied. Iran remains a designated state sponsor of terror and continues to fund terrorism.

66.     The balancing of harms clearly favors entry of an injunction. While Iran is poised to receive some $100-$150 billion in sanctions relief through the JCPOA notwithstanding its continued support for terrorism, Plaintiffs' – victims of Iranian terrorism – approximately $1.5 billion in compensatory damages judgments remain outstanding. Plaintiffs' judgments should be satisfied out of the frozen funds set to be released to Iran under the JCPOA. Defendants will suffer no prejudice since they have no personal stake in the blocked accounts at issue.

67.     Plaintiffs have no adequate remedy at law.

### JURY TRIAL DEMANDED

68.     Plaintiffs demand a trial by jury of all issues which are triable to a jury.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs demand judgment as follows:

(a)     Enjoining Defendants from releasing any sanctions with respect to the Central Bank of Iran until the compensatory damages portion of Plaintiffs' judgments, totaling $152,748,164 in the aggregate, is paid in full;

(b)     Awarding Plaintiffs their costs and reasonable attorneys' fees in prosecuting this action; and

(c)     Ordering such other relief as the Court may deem just and proper.

Dated: August 5, 2015
      Brooklyn, New York

                      Respectfully submitted,

                      THE BERKMAN LAW OFFICE, LLC
                      *Attorneys for the Plaintiffs*

By:  _____
                      Robert J. Tolchin

                      111 Livingston Street, Suite 1928
                      Brooklyn, New York 11201
                      (718) 855-3627

                      NITSANA DARSHAN-LEITNER & CO.
                      Nitsana Darshan-Leitner
                      *Israeli counsel for the plaintiffs*
                      10 Hata'as Street
                      Ramat Gan, 52512 Israel
                      Israeli #: 011-972-523-837-020
                      U.S. #: 212-591-0073