**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHLOMO LEIBOVITCH, GALIT
LEIBOVITCH, HILA LEIBOVITCH, MOSHE
LEIBOVITCH, SHIRA LEIBOVITCH, JENNY
RUBIN, DEBORAH RUBIN, DANIEL
MILLER, ABRAHAM MENDELSON,
STUART HERSH, NOAM ROZENMAN,
ELENA ROZENMAN, TZVI ROSENMAN,
SETH KLEIN BEN HAIM, LAVI KLEIN BEN
HAIM, BERNARD KLEIN BEN HAIM,
SUSAN WEINSTEIN, JOSEPH WEINSTEIN,
JENNIFER WEINSTEIN HAZI and DAVID
WEINSTEIN,

          Plaintiffs,          15 Civ. 6133 (KBF)

      v.

UNITED STATES DEPARTMENT OF STATE;
JOHN KERRY, in his official capacity as
Secretary of State; UNITED STATES
DEPARTMENT OF TREASURY; and JACOB J.
LEW, in his official capacity as Secretary of the
Treasury,

          Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2761
Facsimile: (212) 637-2786

CHRISTOPHER CONNOLLY
Assistant United States Attorney
   —Of Counsel—

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ..............................................................................................................3

    A.    The Foreign Sovereign Immunities Act
          and "Blocked Assets" under TRIA ....................................................................3

    B.    The National Defense Authorization Act ("NDAA")
          and Secondary Sanctions ..................................................................................6

    C.    Implementation of the JCPOA.........................................................................7

    D.    The Complaint ..................................................................................................9

ARGUMENT—THE COMPLAINT SHOULD BE DISMISSED ............................................10

    A.    The Court Lacks Subject-Matter Jurisdiction over
          Plaintiffs' Claims ..........................................................................................11

          1.    Standard of Review for Motions to Dismiss
                Under Rule 12(b)(1) ...........................................................................11

          2.    Plaintiffs Lack Standing Because the Accounts Implicated
                by the Lifting of Sanctions Under the JCPOA Are
                Not "Blocked Assets" ........................................................................11

    B.    The Complaint Fails to State a Claim for Mandamus Relief...............................15

          1.    Standard of Review for Motions to Dismiss Under
                Rule 12(b)(6) .....................................................................................15

          2.    Plaintiffs Are Not Entitled to a
                Writ of Mandamus ............................................................................15

    C.    The Political Question Doctrine Bars Plaintiffs' Claims.......................................16

CONCLUSION................................................................................................................20

## TABLE OF AUTHORITIES

*Page*

Cases:

*Aerotrade, Inc. v. Agency for Int'l Dev.*, 387 F. Supp. 974 (D.D.C. 1974) ...................................14

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...................................................................16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................15, 16

*Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635 (2d Cir. 2005) ................................11

*Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120 (2d Cir. 2009) ...............14

*In re Austrian & German Holocaust Litig.*, 250 F.3d 156 (2d Cir. 2001)...............................17, 18

*Baker v. Carr*, 369 U.S. 186, 217 (1962)................................................................17, 19

*Ballentine v. United States*, 486 F.3d 806 (3d Cir. 2007)..............................................11

*Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006).................................................19

*Bank of New York Co. v. Northeast Bancorp, Inc.*, 9 F.3d 1065 (2d Cir. 1993) ..........................14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 555 (2007) .................................................15

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................14

*Chapman v. S. Buffalo Ry. Co.*, 43 F. Supp. 2d 312 (W.D.N.Y. 1999).....................................14

*Chi. & S. Airlines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103 (1948)..............................19

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) ......................................................14

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ...............................................11

*Dames & Moore v. Regan*, 453 U.S. 654 (1981)..........................................................18

*EM Ltd. v. Republic of Argentina*, 695 F.3d 201 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014) ................................14

*El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010) .............................17

*Escaler v. U.S. Citizenship & Immigration Servs.*, 582 F.3d 288 (2d Cir. 2009)..........................15

*Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986)..........................................17

*Liner v. Jafco, Inc.*, 375 U.S. 301 (1964) ................................................................................14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...........................................................12, 14

*Mahorner v. Bush*, 224 F. Supp. 2d 48 (D.D.C. 2002) ................................................................17

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ...........................................................11

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..............................................................................17

*Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008) ...............................................11

*Peterson v. Islamic Republic of Iran*, No. 13 Civ. 9195 (KBF), 2015 WL 731221
    (S.D.N.Y. Feb. 20, 2015) ......................................................................................................13

*Raines v. Byrd*, 521 U.S. 811 (1997) ..........................................................................................12

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009)..........................................11, 12, 15

*Warth v. Seldin*, 422 U.S. 490 (1975) .........................................................................................11

*U.S. Constitution:*

U.S. Const. Art. II ......................................................................................................................18

*Statutes:*

22 U.S.C. § 8551(a)(1) ...............................................................................................................18

28 U.S.C. § 1361 ..........................................................................................................................9

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*:
    28 U.S.C. § 1605(a)(7).........................................................................................................3, 9
    28 U.S.C. § 1605A................................................................................................................3, 9
    28 U.S.C. § 1609 ...................................................................................................................13

Trading With the Enemy Act, 50 U.S.C. App. 1 *et seq.*:
    50 U.S.C. 5(b)(1) ...............................................................................................................4, 13

International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*:
    50 U.S.C. § 1702(a)(1).......................................................................................................4, 13
    50 U.S.C. § 1702(a)(1)(A)(ii) ..................................................................................................4
    50 U.S.C. § 1702(a)(1)(B) .......................................................................................................4

National Defense Authorization Act for Fiscal Year 2012:
    § 1245(d)(1) ...................................................................................................6, 8, 13
    § 1245(d)(3) ...................................................................................................6, 8, 13
    § 1245(d)(4)(D)(i) .............................................................................................7, 13
    § 1245(d)(5) ......................................................................................................7, 18

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297:
    § 201 ............................................................................................................. *passim*
    § 201(a) ....................................................................................................................4
    § 201(d)(2) .............................................................................................................13
    § 201(d)(2)(A) .........................................................................................................4


*Rules & Regulations:*

Fed. R. Civ. P. 12(b)(1)..................................................................................................1, 11

Fed. R. Civ. P. 12(b)(6)..................................................................................................1, 15

31 C.F.R. § 535.579 .............................................................................................................4

31 C.F.R. § 544.201 .............................................................................................................5

31 C.F.R. § 560.211(a) .........................................................................................................5

31 C.F.R. § 560.211(b) .........................................................................................................5

31 C.F.R. § 561.203 ....................................................................................................6, 7, 13

31 C.F.R. § 594.201 .............................................................................................................5


*Executive Orders:*

Exec. Order No. 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979) .......................................4

Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995)........................................5

Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) ......................................5

Exec. Order No. 13382, 70 Fed. Reg. 38567 (June 28, 2005) .......................................5

Exec. Order No. 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012) ...........................................5

Exec. Order No. 13716, 81 Fed. Reg. 3693 (Jan. 16, 2016)..........................................8

*Miscellaneous:*

Joint Comprehensive Plan of Action, Jul. 14, 2015, preamble and general provisions,
    *available at* http://www.state.gov/documents/organization/245317.pdf ...........................7

Joint Comprehensive Plan of Action, Jul, 14, 2015, Annex II,
    *available at* http://www.state.gov/documents/organization/245320.pdf ...........................8

Joint Comprehensive Plan of Action, Jul, 14, 2015, Annex V,
    *available at* http://www.state.gov/documents/organization/245324.pdf ...........................8

Waiver Determinations and Findings, Oct. 18, 2015, *available at*
    http://www.state.gov/documents/organization/248501.pdf ................................................8

Confirmation of Verification of Iranian Actions Pursuant to the
    Joint Comprehensive Plan of Action, Jan. 16, 2016, *available at*
    http://www.state.gov/documents/organization/251545.pdf ................................................8

U.S. Dep't of Treasury, Frequently Asked Questions Relating to the Lifting of
    Certain U.S. Sanctions Under the Joint Comprehensive Plan of Action (JCPOA)
    on Implementation Day, Jan. 16, 2016, https://www.treasury.gov/resource-
    center/sanctions/Programs/Documents/jcpoa_faqs.pdf ......................................................9

## PRELIMINARY STATEMENT

Defendants the United States Department of State, Secretary of State John Kerry, the United States Department of the Treasury, and Secretary of the Treasury Jacob J. Lew (collectively, the "Government"), by their attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss the Complaint (ECF No. 1) ("Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction, and 12(b)(6), for failure to state a claim on which relief may be granted.

According to the Complaint, plaintiffs are victims of Iranian-sponsored terrorism. Plaintiffs hold federal district court judgments against Iran, which they have attempted to enforce against blocked or frozen Iranian assets pursuant to section 201 of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297 ("TRIA"), which permits judgment-holders to attach certain "blocked" assets of terrorist parties against whom their judgment lies.  In this lawsuit, plaintiffs seek to enjoin the Government from lifting certain sanctions concerning transactions involving Iran, its Central Bank, and other specified Iranian financial institutions as provided for in the Joint Comprehensive Plan of Action ("JCPOA") reached among the "P5+1" (China, France, Germany, Russia, the United Kingdom, and the United States), Iran, and the European Union to ensure that Iran's nuclear program is used exclusively for peaceful purposes.  Plaintiffs allege that overseas bank accounts implicated by the JCPOA's lifting of sanctions are "blocked assets" under TRIA § 201, and that lifting the sanctions will therefore deprive them of the ability to satisfy their judgments.  On January 16, 2016 ("Implementation Day" under the JCPOA), the International Atomic Energy Agency ("IAEA") verified that Iran has implemented key nuclear-related measures described in the JCPOA, and Secretary Kerry confirmed the IAEA's

verification.  As a result of Iran verifiably meeting key nuclear commitments, the United States lifted its nuclear-related sanctions on Iran, including the financial and banking sanctions identified by plaintiffs.

The Complaint should be dismissed for several reasons.  At the threshold, plaintiffs' claims rest on a fundamental mischaracterization of the assets implicated by the JCPOA's lifting of sanctions on Implementation Day.  Plaintiffs claim that TRIA gives them access to billions of dollars in Iranian assets held in accounts outside the United States, including oil funds being withheld from Iranian banks by foreign financial institutions in order to avoid the consequences of now-lifted U.S. "secondary sanctions."  But the assets implicated by the JCPOA's lifting of sanctions are not "blocked assets" under TRIA because they are not seized or frozen by the United States and, indeed, are not within the jurisdiction of the United States to take such action. Instead, the accounts that plaintiffs identify were established by foreign financial institutions in foreign countries, in order to hold amounts owed to Iran, generally for oil purchases by foreign parties.  The lifting of sanctions under the JCPOA allows foreign financial institutions to release such funds to the Central Bank of Iran without being subject to U.S. secondary sanctions.  But it has no impact on plaintiffs' ability to satisfy their U.S. judgments pursuant to TRIA or any other statute, because the accounts in question were never "blocked assets" and were never subject to the jurisdiction of the United States.  Accordingly, plaintiffs lack standing because at no time have they suffered an actual or impending injury in fact that is traceable to the Government's lifting of sanctions pursuant to the JCPOA, or that is redressable by a favorable decision from this Court.

Additionally, plaintiffs fail to state a claim for mandamus relief because the Government does not owe them a non-discretionary duty to maintain the sanctions that were lifted on

Implementation Day and, relatedly, plaintiffs have no clear right to the relief they seek. Finally, plaintiffs' claims are barred by the political question doctrine, as they put squarely at issue the President's decision to lift certain sanctions against Iran, and thus implicate foreign affairs and national security considerations that are entrusted to the Executive Branch. In these circumstances, granting the relief plaintiffs seek would undermine the Executive's decisions concerning how best to achieve and implement a multilateral arrangement aimed at addressing the international community's longstanding concerns regarding Iran's nuclear program.

## **BACKGROUND**

### A.    **The Foreign Sovereign Immunities Act and "Blocked Assets" under TRIA**

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, provides that:

> [a] foreign state [designated as a state sponsor of terrorism] shall not be immune from the jurisdiction of courts of the United States . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A. In other words, the FSIA precludes immunity claims by foreign sovereigns designated as state sponsors of terrorism, and allows federal courts to exercise jurisdiction over those sovereigns, where plaintiffs seek money damages for injuries or death sustained as a result of the enumerated acts engaged in by the foreign state, its agents, or its personnel.

In TRIA § 201, Congress provided that:

> [n]otwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [FSIA] section 1605A or 1605(a)(7) [a predecessor statute] . . . the blocked assets of that terrorist party

3

> (including the blocked assets of any agency or instrumentality of
> that terrorist party) shall be subject to execution or attachment.

TRIA § 201(a) (*reprinted at* 28 U.S.C. § 1610 note).  TRIA defines the term "blocked asset" as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act ["TWEA"] (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act ["IEEPA"] (50 U.S.C. 1701; 1702)."  *Id.* § 201(d)(2)(A).  TWEA and IEEPA, in turn, delineate the authority of the Executive with respect to transactions and property of "any foreign country or national thereof" that are within the jurisdiction of the United States.  50 U.S.C. § 5(b)(1); 50 U.S.C. §§ 1702(a)(1)(A)(ii), (a)(1)(B).  Specifically, TWEA and IEEPA authorize the President to, among other things, prohibit transactions "by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. § 5(b)(1); 50 U.S.C. § 1702(a)(1).

As part of its sanctions regime against Iran, the United States has invoked IEEPA on multiple occasions to block Iranian assets within the jurisdiction of the United States.  For example, following the November 1979 seizure of the U.S. Embassy in Tehran, President Carter invoked IEEPA to block transactions in "all property and interests in property of the Government of Iran" that had specified ties to the United States.  Exec. Order No. 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979).  The Department of the Treasury's Office of Foreign Assets Control ("OFAC") implemented this order through regulations that prohibited any transaction involving property in which Iran had "any interest of any nature whatsoever," unless authorized by an OFAC license.  *See* 44 Fed. Reg. 65956 (Nov. 15, 1979).  Following the conclusion of the Algiers Accords on January 19, 1981, the President directed the transfer of previously blocked property and OFAC issued a general license that eliminated the obligation to block Iranian property that came into the United States thereafter.  *See* 31 C.F.R. § 535.579.

In 2001 and 2005, respectively, President Bush invoked IEEPA to block the assets of designated persons who "commit, threaten to commit, or support terrorism" or are involved in "the proliferation of weapons of mass destruction and the means of delivering them." Exec. Order No. 13224, 66 Fed. Reg. 49079, 49079 (Sept. 25, 2001); Exec. Order. No. 13382, 70 Fed. Reg. 38567, 38567 (June 28, 2005); *see also* 31 C.F.R. § 594.201; 31 C.F.R. § 544.201. Numerous Iranian persons, including certain Iranian financial institutions, have been designated pursuant to these counter-terrorism and counter-proliferation authorities; this requires the blocking of their property and interests in property that are in the United States or under the possession or control of a United States person.

In 2012, President Obama blocked, among other things, and with some exceptions, "[a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States." Exec. Order No. 13599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012); *see also* 31 C.F.R. § 560.211(a). The President did so "in order to take additional steps with respect" to a national emergency that had first been declared in 1995, and that stemmed from various dangerous policies of the Iranian government. 77 Fed. Reg. at 6659; Exec. Order No. 12957, 60 Fed. Reg. 14615, 14615 (Mar. 15, 1995). The executive orders issued in connection with the 1995 national emergency, including the 2012 executive order blocking the property of the Government of Iran and Iranian financial institutions, are implemented through the Iranian Transactions and Sanctions Regulations ("ITSR"), which block the property and interests in property of the Government of Iran and Iranian financial institutions, including the Central Bank of Iran, when the property or interests in property of those parties "come within the United States, or . . . come within the possession or control of any United States person, including any foreign branch . . ." *See* 31 C.F.R. § 560.211(a), (b).

5

**B.      The National Defense Authorization Act ("NDAA") and Secondary Sanctions**

The United States has also implemented "secondary sanctions" on non-U.S. persons concerning Iran and Iranian financial institutions that, unlike the sanctions outlined above, operate with respect to assets and property that are not within the jurisdiction of the United States.  Relevant here, when in effect, section 1245 of the National Defense Authorization Act for Fiscal Year 2012 ("NDAA"), as amended by the Iran Threat Reduction and Syria Human Rights Act of 2012 and the Iran Freedom and Counter-Proliferation Act of 2012, aimed to reduce Iranian oil revenues and discourage transactions with the Central Bank of Iran by imposing sanctions on foreign financial institutions that engaged in certain transactions with the Central Bank of Iran or other specified Iranian financial institutions.  The NDAA requires the imposition of sanctions—in the form of prohibitions or conditions on the opening or maintaining of correspondent or payable-through accounts in the United States—on foreign financial institutions, including foreign central banks, that are determined to have knowingly conducted or facilitated "any significant financial transaction with the Central Bank of Iran" or other designated Iranian financial institutions.  *See* NDAA §§ 1245(d)(1), (3); *see also* 31 C.F.R. § 561.203.  Put another way, the NDAA targets Iran by restricting or cutting off access to the U.S. financial system for foreign financial institutions that engage in certain dealings with Iran, thereby imposing costs on non-Iranian foreign financial institutions that choose to conduct sanctionable transactions with Iranian financial institutions.

Section 1245 of the NDAA and OFAC's implementing regulations provide an exception that allows foreign financial institutions that engage in transactions related to trade with Iran, including purchases of Iranian oil, to avoid the NDAA's sanctions.  The previously discussed sanction on foreign financial institutions does not apply if the President determines that the

country with primary jurisdiction over the foreign financial institution has significantly reduced its volume of crude oil purchases from Iran (or has maintained import levels at zero), the transactions related to trade in goods and services between the country with primary jurisdiction over the foreign financial institution and Iran, and "any funds owed to Iran as a result of such trade are credited to an account located in the country with primary jurisdiction over the foreign financial institution," *i.e.*, if the foreign financial institution withholds payment to Iran and instead maintains any funds owed to Iran in a separate account in the country where the financial institution is located.   NDAA § 1245(d)(4)(D)(i), (ii); *see also* 31 C.F.R. § 561.203.   As explained further below, funds owed to Iran from this "bilateral trade" and maintained in such accounts are a focus of the JCPOA's sanctions-lifting commitments, as well as plaintiffs' claims in this lawsuit.   Moreover, the NDAA authorizes the President to waive the imposition of sanctions if he (i) "determines that such a waiver is in the national security interests of the United States"; and (ii) submits a report to Congress that, among other things, certifies that the country with primary jurisdiction over the foreign financial institution faced exceptional circumstances that prevented it from significantly reducing its petroleum purchases from Iran.  *Id.* § 1245(d)(5).

## C.    **Implementation of the JCPOA**

On July 14, 2015, the P5+1 (including the United States), the European Union, and Iran concluded the JCPOA, the purpose of which is to "ensure the exclusively peaceful nature of Iran's nuclear programme."   JCPOA, preamble and general provisions, Jul. 14, 2015, *available at* http://www.state.gov/documents/organization/245317.pdf.   Among other things, the JCPOA provides that, in the event the IAEA verifies that Iran has implemented key nuclear-related measures specified in the JCPOA, the United States will lift its nuclear-related sanctions— including, as relevant here, "[s]anctions on transactions with individuals and entities" including

the Central Bank of Iran and other designated Iranian banks, as provided for in NDAA §§ 1245(d)(1) and (3). *See* JCPOA, Annex II, ¶ 4.1.1, *available at* http://www.state.gov/documents/organization/245320.pdf.

On October 18, 2015 ("Adoption Day" under the JCPOA), the Secretary of State (to whom the President has delegated his authority to issue waivers under section 1245(d)(5) of the NDAA) waived, among other sanctions, the imposition of the financial and banking sanctions identified in the JCPOA, contingent upon his confirmation that the IAEA had verified that Iran had fulfilled its necessary nuclear commitments under the JCPOA. *See* Waiver Determinations and Findings, Oct. 18, 2015, *available at* http://www.state.gov/documents/organization/248501.pdf. On January 16, 2016 ("Implementation Day"), the President signed Executive Order 13716, which, among other things, revokes various sanctions authorities as they relate to Iran's nuclear program in order to give effect to U.S. commitments under the JCPOA. *See* Exec. Order No. 13716, 81 Fed. Reg. 3693 (Jan. 16, 2016). At the same time, Secretary Kerry confirmed the IAEA's verification that Iran had "fully implemented its required commitments" under the JCPOA, and further confirmed that "[t]he U.S. sanctions-related commitments described in Sections 17.1-17.5 of Annex V of the JCPOA are now in effect." Confirmation of Verification of Iranian Actions Pursuant to the Joint Comprehensive Plan of Action, Jan. 16, 2016, *available at* http://www.state.gov/documents/organization/251545.pdf; *see also* JCPOA, Annex V, ¶¶ 17.1-17.2 (providing that on Implementation Day, the United States will, among other things, "[c]ease the application" of the financial and banking sanctions, among others, set forth in Annex II). In other words, as of Implementation Day, the nuclear-related "secondary sanctions" identified in Annex II of the JCPOA—including the sanctions imposed on foreign financial institutions that

engage in significant transactions with the Central Bank of Iran or designated Iranian financial institutions—have been lifted. *See* U.S. Dep't of Treasury, Frequently Asked Questions Relating to the Lifting of Certain U.S. Sanctions Under the Joint Comprehensive Plan of Action (JCPOA) on Implementation Day, Jan 16, 2016, ¶ A.2, https://www.treasury.gov/resource-center/sanctions/Programs/Documents/jcpoa_faqs.pdf.

## D.   The Complaint

Plaintiffs commenced this action by filing their Complaint on August 5, 2015.  According to the Complaint, plaintiffs are victims of Iranian-sponsored terrorism who have obtained judgments against Iran in U.S. courts under either FSIA § 1605(a)(7) or FSIA § 1605A.  Compl. ¶¶ 9-12.  Plaintiffs claim that, since obtaining their judgments, they "have attempted, with mixed success, to enforce their judgments against a variety of blocked or frozen assets of Iran in the United States," and that "the vast majority of [their] judgments remain outstanding." *Id.* ¶ 24.

Plaintiffs allege that they "are entitled to enforce their judgments against the blocked or frozen assets of Iran pursuant to, *inter alia*, [TRIA § 201]," *id.* ¶ 19, and that the assets implicated by the lifting of sanctions pursuant to the JCPOA qualify as "blocked assets" under that provision and are therefore subject to judgment enforcement, *id.* ¶ 48.  Specifically, they assert that the lifting of sanctions under the JCPOA "will enable Iran to access $100 to $150 billion in hard currency mainly from frozen oil profits that are accumulating in . . . restricted escrow accounts held by foreign financial institutions." *Id.*  Accordingly, they claim that "the lifting of sanctions will result in Plaintiffs losing their only remaining leverage against Iran to enforce their judgment." *Id.*

Based on this claim, plaintiffs assert two causes of action.  First, they seek a writ of mandamus pursuant to 28 U.S.C. § 1361, on the grounds that the Government owes them "a duty

9

. . . not to hinder their ability to enforce their federal judgments," *id.* ¶ 54; that lifting sanctions under the JCPOA deprives them of "the ability to enforce their judgments," and therefore "constitutes an unconstitutional taking without just compensation in violation of the Fifth Amendment," *id.* ¶ 57; and that they "will suffer irreparable injury unless [the Government is] compelled to leave the sanctions in place until the compensatory damages of Plaintiffs' judgment are collected in full," *id.* ¶ 58.   Second, plaintiffs request an injunction requiring "that the sanctions against the Central Bank of Iran and other Iranian financial institutions" as described in the JCPOA "remain in place" until the compensatory damages portion of their judgment is paid, *id.* ¶ 61, because "[u]pon implementation of the JCPOA, United States sanctions will be lifted and the accounts will not be subject to enforcement under TRIA § 201," *id.* ¶ 64.

## ARGUMENT

### THE COMPLAINT SHOULD BE DISMISSED

The Complaint should be dismissed for three reasons.  First, plaintiffs lack standing to bring their claims because they have not suffered an injury in fact that is directly traceable to the lifting of sanctions under the JCPOA.  Plaintiffs mischaracterize the nature of the assets that are implicated by the lifting of sanctions: those assets were placed in foreign accounts by foreign financial institutions and have never been within the jurisdiction of the United States, and therefore are not "blocked assets" for purposes of TRIA § 201.  In other words, TRIA never provided a basis for plaintiffs to satisfy their judgments out of such foreign accounts, and thus the lifting of secondary sanctions relating to those assets has not resulted in a legally cognizable injury to plaintiffs that is traceable to the Government's actions and redressable by a favorable decision here.  Second, the first claim in the Complaint is also subject to dismissal pursuant to

10

Rule 12(b)(6) because plaintiffs fail to state a claim for mandamus relief. Finally, plaintiffs'
claims are barred by the political question doctrine.

## A.   The Court Lacks Subject-Matter Jurisdiction over Plaintiffs' Claims

### 1.   Standard of Review for Motions to Dismiss Under Rule 12(b)(1)

"The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance
of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir.
2005). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)
when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v.
United States*, 201 F.3d 110, 113 (2d Cir. 2000). While, in general, the court must "take all facts
alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff,"
jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the
pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547
F.3d 167, 170 (2d Cir. 2008) (citations and internal quotation marks omitted).

### 2.   Plaintiffs Lack Standing Because the Accounts Implicated by the Lifting of Sanctions Under the JCPOA Are Not "Blocked Assets"

The Complaint is subject to dismissal because plaintiffs lack standing to assert their
claims. "Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and
'Controversies.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). "One element of
the case-or-controversy requirement is that plaintiffs must establish that they have standing to
sue." *Id.* (quotation marks omitted). Standing "is the threshold question in every federal case,
determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498
(1975). "A motion to dismiss for want of standing is . . . properly brought pursuant to [Rule]
12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806,
810 (3d Cir. 2007); *see also Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88-89 (2d Cir. 2009)

(beginning its review of district court's dismissal under Rule 12(b)(1) by "consider[ing] whether plaintiffs have established Article III standing").

To establish standing, plaintiffs must demonstrate: (1) that they have "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that there is a sufficient "causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotation marks and citations omitted); *accord Selevan*, 589 F.3d at 89.

Plaintiffs do not meet these requirements.  First, plaintiffs have not suffered an injury in fact because they have not experienced an "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560; *see also Raines v. Byrd*, 521 U.S. 811, 819 (1997) ("We have also stressed that the alleged injury must be legally and judicially cognizable.").  Here, plaintiffs' mischaracterization of the accounts implicated by the lifting of sanctions is fatal to their claim.

Plaintiffs' claims are grounded in their assertion that the lifting of sanctions as provided for in the JCPOA released "blocked assets" as that term is defined in TRIA § 201, thereby causing plaintiffs to "los[e] their only remaining leverage against Iran to enforce their judgments."  Compl. ¶ 48.  There are two fundamental problems with this argument, both of them apparent from a plain reading of TRIA.  First, the assets plaintiffs describe are not "blocked" for purposes of TRIA.  TRIA defines "blocked assets" as "any asset seized or frozen by the United States under section 5(b) of [TWEA] or under sections 202 and 203 of [IEEPA]."  But the secondary sanctions under the NDAA did not seize or freeze Iranian assets.  Rather, they imposed restrictions on the ability of foreign financial institutions to open or maintain

correspondent or payable-through accounts in the United States if the President determined that the foreign financial institutions engaged in significant transactions with the Central Bank of Iran or designated Iranian financial institutions.  *See* NDAA §§ 1245(d)(1), (3); *see also* 31 C.F.R. § 561.203.  While the purposes of these sanctions were to deter foreign banks from facilitating financial transactions for the Central Bank of Iran or designated Iranian financial institutions and to restrict Iran's access to the international financial system and thus to cash from oil sales, the sanctions did not purport to direct the foreign financial institutions to block Iranian funds.  In fact, they did not impose direct restrictions on the foreign financial institutions.  This is in stark contrast to the obligations of U.S. persons to block the property or interests in property of persons blocked pursuant to IEEPA, and the prohibition on U.S. persons engaging in any transactions or dealings in such blocked property.  Indeed, TRIA specifies that its provisions apply to assets that are blocked under TWEA and IEEPA, neither of which reaches the foreign bank accounts at issue here.  *See* TRIA § 201(d)(2).

Second, assets may be seized or frozen pursuant to TWEA or IEEPA—and therefore qualify as "blocked assets" for purposes of TRIA § 201—only if they are "subject to the jurisdiction of the United States."  *See* 50 U.S.C. § 5(b)(1); 50 U.S.C. § 1702(a)(1).  But the accounts at issue here are not United States accounts; rather, they were established or maintained by foreign financial institutions, in foreign countries, for the purpose of holding funds owed to Iran.  *See* NDAA § 1245(d)(4)(D)(i), (ii); *see also* 31 C.F.R. § 561.203.  Moreover, the FSIA itself does not allow for attachment of property located outside of the United States.  *See* 28 U.S.C. § 1609 ("[T]he property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.");  *accord Peterson v. Islamic Republic of Iran*, No. 13 Civ. 9195 (KBF), 2015 WL 731221, at *10

(S.D.N.Y. Feb. 20, 2015) (citing *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009)).

For these reasons, plaintiffs did not "suffer[ ] an injury in fact" with a "causal connection" to the lifting of sanctions as provided for in the JCPOA. *Lujan*, 504 U.S. at 560-61. The lifting of sanctions had no legally cognizable impact under either TRIA § 201 or any other provision of U.S. law on plaintiffs' ability (or lack thereof) to seek to satisfy their judgments by attaching or collecting the assets in question. *See, e.g., Bennett v. Spear*, 520 U.S. 154, 167 (1997) (injury must be "fairly traceable to the challenged action" (citing *Lujan*, 504 U.S. at 560-61)). Relatedly, plaintiffs lack standing because, even if they could identify a cognizable injury, that injury could not "be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. Plaintiffs' purported injury is that, absent injunctive relief, they could not satisfy their judgment pursuant to TRIA § 201 by attaching the assets in certain overseas bank accounts. But because those assets are not TRIA "blocked assets" in the first place, an order requiring the Government refrain from honoring its commitments under the JCPOA or, in light of Implementation Day, to re-impose the sanctions that were lifted, would not provide plaintiffs with the relief they seek. *See, e.g., Aerotrade, Inc. v. Agency for Int'l Dev.*, 387 F. Supp. 974, 975-76 (D.D.C. 1974) (plaintiff lacked standing where relevant statute did not provide for relief it sought).[1]

---

[1]     Insofar as plaintiffs ask the Court to enter an order preventing the Government from lifting sanctions under the JCPOA, *see, e.g.,* Compl. ¶¶ 53-55, 58, 61, 64, the lifting of sanctions on Implementation Day rendered such requests for relief moot, *see e.g., Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n.3 (1964) (court's ability to review cases "depends upon the existence of a case or controversy"); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) ("a case is moot when the issues presented are no longer live"); *Chapman v. S. Buffalo Ry. Co.,* 43 F. Supp. 2d 312, 318 (W.D.N.Y. 1999) ("An issue is mooted where the activities the plaintiff seeks to enjoin have already occurred and the court cannot undo what has already been done.") (citing *Bank of New York Co. v. Northeast Bancorp, Inc.,* 9 F.3d 1065, 1067 (2d Cir. 1993)).

**B.** **The Complaint Fails to State a Claim for Mandamus Relief**

    **1.** **Standard of Review for Motions to Dismiss Under Rule 12(b)(6)**

Rule 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  In considering a Rule 12(b)(6) motion, a court must "assume all 'well-pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'"  *Selevan*, 584 F.3d at 88 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  Allegations that are "no more than conclusions[ ] are not entitled to the assumption of truth," and "'naked assertions' devoid of 'further factual enhancement'" or "the-defendant-unlawfully-harmed-me accusation[s]" are not sufficient to show that a plaintiff is entitled to relief.  *Iqbal*, 556 U.S. at 678-79 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 555, 557 (2007)).  Nor must a court accept as true "legal conclusions" or "a legal conclusion couched as a factual allegation."  *Id.* (citation and internal quotation marks omitted).  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.

    **2.** **Plaintiffs Are Not Entitled to a Writ of Mandamus**

Plaintiffs' first claim must also be dismissed under Rule 12(b)(6) because it fails to state a claim for mandamus relief.  *See* Compl. ¶¶ 50-57.  "[M]andamus is an extraordinary remedy, intended to aid only those parties to whom an official or agency owes a *clear nondiscretionary duty*."  *Escaler v. U.S. Citizenship & Immigration Servs.*, 582 F.3d 288, 292 (2d Cir. 2009) (citation and internal quotation marks omitted; emphasis added).  Accordingly, "[a] party who seeks a writ of mandamus must show a clear and indisputable right to its issuance."  *Id.* (citation and internal quotation marks omitted).  Plaintiffs simply cannot meet this high threshold: they do not, and cannot, identify any provision of law that would require the Government to refrain from

15

honoring its commitments in the JCPOA in order to preserve plaintiffs' purported right to seek to attach funds held in overseas bank accounts.

At most, plaintiffs attempt to ground such a right in TRIA § 201, *see* Compl. ¶¶ 21, 53, but TRIA does not provide a cause of action that permits plaintiffs to raise their claims—it merely allows for the attachment of certain blocked assets, *see Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("private rights of action to enforce federal laws must be created by Congress," and if the text of the statute does not create a judicially enforceable right, a "court[] may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute").

Furthermore, as explained above, TRIA § 201 does not apply here because the assets implicated by the lifting of sanctions under the JCPOA are not "blocked assets" subject to United States jurisdiction (nor would they be susceptible to attachment under the FSIA). Thus, even to the extent that TRIA might arguably give rise to a duty on the part of the Government (which is doubtful), no such duty exists here. Nor can plaintiffs ground a mandamus claim in their conclusory allegation that the lifting of sanctions constitutes a "taking" in violation of the Fifth Amendment. Compl. ¶ 57. That allegation is a mere "legal conclusion." *Iqbal*, 556 U.S. at 678-79. Moreover, the lifting of sanctions cannot constitute a taking because plaintiffs cannot establish that they hold a legal interest in any property allegedly taken from them by the JCPOA, and in any event, as explained above, the JCPOA has no effect on plaintiffs' ability or lack thereof to seek to attach assets in foreign bank accounts.

## C.     The Political Question Doctrine Bars Plaintiffs' Claims

Lastly, even if plaintiffs had standing to bring this action, the Complaint should still be dismissed because plaintiffs' claims are barred by the political question doctrine.

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986); *see also Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) ("no justiciable 'controversy' exists when parties seek adjudication of a political question"). Among other things, the doctrine "bars [judicial] review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010); *see also In re Austrian & German Holocaust Litig.*, 250 F.3d 156, 163–64 (2d Cir. 2001) (per curiam) ("separation of powers prohibits the federal courts from excursions into areas" such as "[t]he conduct of foreign relations" that are "committed to the Executive Branch or the Legislative Branch").

In *Baker v. Carr*, the Supreme Court identified six situations that constitute political questions, any one of which can render a controversy non-justiciable:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962). Although "not every case or controversy which touches foreign relations lies beyond judicial cognizance," *id.* at 211, the *Baker* factors have particular application to decisions in the foreign policy and military arenas, *see Mahorner v. Bush*, 224 F.

Supp. 2d 48, 52 (D.D.C. 2002) ("Courts have developed through a long line of cases that matters involving foreign policy and military decisions are political in nature, and not within the province of the judicial branch.").

Plaintiffs' claims, and their request for injunctive relief to block implementation of the JCPOA, fall within the concerns animating the political question doctrine.  Even if TRIA § 201 or the FSIA could be construed as permitting the attachment of the assets held in foreign bank accounts—which, as explained above, it cannot—the President would nonetheless retain the authority to "unblock" such assets by lifting the sanctions that apply to them.  *See, e.g., Dames & Moore v. Regan*, 453 U.S. 654, 685 (1981) ("The FSIA was thus designed to remove one particular barrier to suit, namely sovereign immunity, and cannot be fairly read as prohibiting the President from settling claims of United States nationals against foreign governments.").  That decision would be well within the President's authority, *see* U.S. Const. art. II, and review of the President's decision to lift sanctions would amount to a political question deserving of respect from the courts.[2]

In these circumstances, the Court's review of the implementation of the JCPOA and, by extension, the lifting of certain financial and banking sanctions, would put at issue sensitive and important national security considerations, and the Court's granting of an injunction preventing or hindering the implementation of this multilateral arrangement would amount to a judicial intrusion on "[t]he conduct of foreign relations."  *In re Austrian & German Holocaust Litig.*, 250 F.3d at 163–64.  Indeed, the relief requested here does not merely touch on foreign policy, but

---

[2]        Plaintiffs' claim that the President may only lift the sanctions at issue if he first certifies to Congress that "'the Government of Iran has ceased providing support for acts of international terrorism and no longer satisfies the requirements for designation as a state sponsor of terrorism,'" Compl. ¶ 35 (quoting 22 U.S.C. § 8551(a)(1)), ignores that the President is authorized under the NDAA to waive sanctions where he "determines that such a waiver is in the national security interest of the United States," NDAA § 1245(d)(5).

would require this Court to reexamine a foreign policy decision already made that is precisely "'of a kind clearly for nonjudicial discretion.'"  *Bancoult v. McNamara*, 445 F.3d 427, 436 (D.C. Cir. 2006) (quoting *Baker*, 369 U.S. at 217); *see also id.* at 437 ("[W]e may not dictate to the executive what its priorities should have been.  In this respect, the specific steps taken [by the Executive] did not merely touch on foreign policy, but rather constituted foreign policy decisions themselves."); *Chi. & S. Airlines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948) (foreign policy decisions "are decisions of a kind for which the judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry").  Moreover, there is no countervailing interest of the judiciary here, because plaintiffs cannot identify any entitlement under U.S. law to the assets in question—indeed, the lifting of the sanctions has had no effect on their inability to satisfy their judgment on the basis of those assets pursuant to TRIA § 201, because the assets were never attachable under TRIA and, in any event, the Executive clearly had the unreviewable authority to lift any applicable sanctions.  Furthermore, and particularly in light of the Executive Branch's actions giving effect to the JCPOA's sanctions-lifting on Implementation Day, granting plaintiffs the relief they seek would undoubtedly "express[ ] lack of respect due coordinate branches of government," and would risk "embarrassment from multifarious pronouncements" on a major foreign policy initiative whose implementation had, in any event, no effect on the ability of U.S. judgment-holders against Iran to seek to satisfy their judgments through the attachment of blocked assets.  *See Baker*, 369 U.S. at 217.  Accordingly, the Court may dismiss plaintiffs' claims on political question grounds as well.

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed.

Date:   New York, New York
        February 2, 2016

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York
                                    *Attorney for Defendants*

                            By:   /s/ Christopher Connolly
                                    CHRISTOPHER CONNOLLY
                                    Assistant United States Attorney
                                    86 Chambers Street, 3rd Floor
                                    New York, New York 10007
                                    Tel.: (212) 637-2761
                                    Fax: (212) 637-2786
                                    christopher.connolly@usdoj.gov